UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **VERONICA S. AKPAN,** | : | |
| *Plaintiff* | : | |
| | : | |
| **V.** | : | **C.A. NO.:** |
| | : | **Jury Trial Demanded** |
| **RHODE ISLAND HOSPITAL, alias,** | : | |
| **and LIFESPAN CORPORATION, alias** | : | |
| *Defendants* | : | |

## COMPLAINT

### I.      Introduction

1.      This is an action brought by Plaintiff, Veronica S. Akpan, against the Defendants, Rhode Island Hospital., alias, and Lifespan Corporation , alias, seeking compensatory and punitive damages, counsel fees, costs, and other equitable relief arising out of violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws §28-5-1, *et seq.* ("FEPA"), the Rhode Island Civil Rights Act, R.I.G.L. §42-112-1, *et seq.* ("RICRA"), and the Rhode Island Whistleblower Protection Act, R.I. Gen. Laws § 28-50-1, *et seq.* ("Whistleblower Act")

### II.      Parties

2.      Plaintiff Veronica S. Akpan ("Plaintiff") is a resident of the City of North Providence, County of Providence, and State of Rhode Island, and at all times relevant to this action was an employee employed by Defendants in the State of Rhode Island.

3.      Defendant Rhode Island Hospital, alias, is a domestic non-profit corporation duly organized and incorporated under the laws of the State of Rhode Island, with a principal place of business located at 593 Eddy Street, Providence, RI 02903.

4.      Defendant Lifespan Corporation, alias, is a domestic non-profit corporation duly organized and incorporated pursuant to the laws of the State of Rhode Island with a principal place of business located at 167 Point Street, Providence, Rhode Island 02903 place of business located at 593 Eddy Street, Providence, RI 02903.

5.      As used herein, the term "Defendants" refers to both Defendants unless otherwise noted.

### III.      Jurisdiction

6.      The United States District Court for the District of Rhode Island has federal subject matter jurisdiction over this case pursuant to the provisions of 28 U.S.C. §1331 because Plaintiff asserts claims arising under federal law; specifically, Title VII, 42 U.S.C. §2000e, *et seq*., and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. §1367 as they arise out of the same case or controversy.

### IV.      Venue

7.      Pursuant to the requirements set forth in 28 U.S.C. §1391, venue is proper in this Court insofar as Defendants are doing business in Rhode Island and therefore are deemed to reside in the District of Rhode Island.  Moreover, a substantial part of the acts and/or omissions giving rise to the claims asserted herein occurred in the District of Rhode Island.

### V.      Exhaustion of Administrative Remedies

8.      On or about February 15, 2021, Plaintiff filed a Charge of Discrimination with the Rhode Island Commission for Human Rights ("RICHR") and the United States Equal Employment Opportunity Commission ("EEOC") against Defendants alleging discrimination on the basis of race, color, and/or age, retaliation, and hostile workplace.

9.      Thereafter, and in accordance with R.I. Gen. laws §28-5-24.1(c), Plaintiff elected to terminate all proceedings before the RICHR and the EEOC and to have her case heard in Court.

10.     On or about April 26, 2022, the RICHR issued Plaintiff a Notice of Right to Sue.

11.     On or about June 29, 2022, the EEOC issued a Notice of Right to Sue.

12.     Accordingly, Plaintiff has timely and properly exhausted her administrative remedies and thereby satisfied all pre-conditions to bringing the within action.

## VI.   **Material Facts**

### *Employment Background*

13.     At all relevant times, Plaintiff was a member of a protected class because she is Black, African-American and, at all times relevant to the discrimination claims asserted herein, Plaintiff was an older employee, being sixty-one (61) years of age when she was terminated by Defendants, being born September 18, 1958.

14.     Plaintiff was first hired by Defendants on or about May 1995 as a Registered Nurse at Rhode Island Hospital.

15.     At all relevant times and at the time of her separation, Plaintiff was the only Black and African-American nurse in her unit.

16.     From on or about May 1995 until on or about August 2013, Plaintiff was an exemplary, loyal, dedicated, and productive employee with great reviews and without any prior history of warnings or disciplinary actions.

17.     On or about August 2013 Plaintiff sustained a fall while working and injured her left should and right knee, requiring two surgeries, physical therapy, light duty, and a leave of absence for over a year and a half.

### *Defendants' Initial Discriminatory Conduct*

18.     When Plaintiff was able to return to her duties she was informed that she had fired because she had been out of work for too long.

19.     However, prior to Plaintiff's termination, another employee, Julie Blair, a White woman, had been on a leave of absence for an injury longer than Plaintiff had been, but she was permitted to retain her position.

20.     A representative from Plaintiff's union, the United Nurses and Allied Professional (UNAP) became involved in Plaintiff's situation with Defendants and was able to convince them to rehire Plaintiff.

21.     Since this first incident of discrimination described above, Plaintiff has been harassed, discriminated against, and made to feel uncomfortable at her place of work.

22.     On information and belief, the harassment and discrimination Plaintiff has been forced to endure have been motivated, in whole in or part, by Plaintiff's race, color, and/or age.

23.     Following Plaintiff's rehiring in or around April 2015, Plaintiff had a new direct supervisor, Erin Truman ("Truman"), Clinical Manager for Defendant RIH.

24.     On or about December 4, 2015, while Plaintiff was out on FMLA and sick leave, Plaintiff asked about using her over 120 hours of sick leave she had available to be paid because she had been told she had to request the use of such hours explicitly.

25.     On or about December 11, a week later, Truman told Plaintiff that she could adjust Plaintiff's benefits until she was added back into the active employee system, Workbrain.

26.     When Plaintiff had still not received sick pay by on or about December 21, 2015 Plaintiff contacted Defendants' benefit department directly and learn that it was Truman's responsibility to pay Plaintiff her sick leave and that Truman had done so for other employees but not for Plaintiff.

27.     Plaintiff emailed Truman inquiring why she had been treated differently, why she had not been able to use her paid sick leave the same way other employees had, and why it had taken her over two weeks to act on Plaintiff's request to be paid for sick leave she was entitled  to.

28.     Rather than responding to Plaintiff's question Truman forwarded Plaintiff's email to Defendants' HR department.

29.     On information and belief, Truman resolved such matters for White employees without escalating to human resources, responded to the inquiries of White employees in a timely manner, and treated White employees more favorably with respect to benefits such as sick leave pay.

30.     The HR department merely reiterated that Plaintiff had to request to use sick leave pay but did not address Plaintiff's questions about why she was being treated differently .

31.     Due to the unnecessary delay caused by Truman Plaintiff only received one week worth of sick pay before she returned to work.

32.     In or about January 2016, upon returning from FMLA and sick leave, Truman unilaterally changed Plaintiff's eight (8) hour shift from 11:15 p.m. to 7:15 a.m. to 11:30 p.m. to 7:30 a.m. without even consulting or speaking with Plaintiff.

33.     This scheduling change would have resulted in Plaintiff's break period becoming unpaid whereas the previous schedule had no unpaid break period deduction.

34.     On information and believe Plaintiff was the only person subjected to this unilateral shift change.

35.     Plaintiff complained and objected to Truman and to Defendants about the scheduling change to no avail.

36.     On April 12, 2016, Plaintiff also sent an email to Truman explaining that Plaintiff felt she was being treated unfairly.

37.     Specifically, Plaintiff told Truman that Plaintiff's requests to work different hours were repeatedly denied while the requests for days off from other nurses, even ones less senior than Plaintiff, were being granted, that when Plaintiff would request to work a 12-hour shift, she was scheduled for an 8-hour shift, that when Plaintiff requested to work an 8-hour shift, she was

scheduled for a 12-hour shift, and that this had happened even on a day when a new hire was granted a requested day off.

38.     It was until Plaintiff's union representative got involved that Defendants finally returned Plaintiff to her previously scheduled 8-hour shift of 11:15 p.m. to 7:15 a.m..

*Additional Adverse Employment Action After Complaints of Unequal Treatment*

39.     Almost immediately after Plaintiff complained of discrimination and unequal treatment, Defendants, by and through their agents and/or employees, began taking adverse employment actions against Plaintiff as follows.

40.     Subsequent to Plaintiff's complaints about discrimination, Defendants suddenly began attempting to discipline her for baseless and/or trivial allegations for the first time ever.

41.     On or about June 8, 2016, Plaintiff received an email from Truman directing Plaintiff to make an appointment with UNAP to meet with Plaintiff and HR because Truman had received a patient complaint.

42.     Plaintiff made the appointment, as directed, but Truman continually cancelled the appointments or declined to respond to proposed times; ultimately, Truman never followed up, there was never any meeting with HR, and Plaintiff was not provided any more information at that time.

43.     On another occasion around the same timeframe, Plaintiff was treating a patient when she found albuterol by the patient's bedside, which is prohibited.

44.     Following hospital protocol, Plaintiff moved the patient's albuterol to the patient's lockbox, obtained the albuterol provided by the hospital, scanned it, and when the patient got upset, Plaintiff explained the hospital protocols to the patient.

45.     That patient then complained about Plaintiff to another White nurse, who reported the complaint to Truman.

46.     Truman again responded that Plaintiff needed to address the incident with HR.

47.     In response to both patient complaints, Truman declined to conduct any sort of investigation, and instead simply ordered Plaintiff to report to HR.

48.     However, despite Truman's order to report to HR, she failed to follow up or be responsive within the HR process and as a result there were never any meetings with HR.

49.     In or about January 2017, Plaintiff received an email from Truman advising that Risk Management wanted to talk to Plaintiff about the purported patient complaint against her in or about June 2016, six-months prior.

50.     When Plaintiff spoke with Risk Management, she learned that the patient had returned to the hospital to ask about the nurse that the patient had previously reported, which had been the second shift nurse, who was White, and Plaintiff had treated the patient later than night.

51.     Because the complaint had been made about another nurse, Risk Management had only wanted to talk to Plaintiff to learn what she knew about the patient's care on the night in question.

52.     However, Truman had wrongfully informed Plaintiff that Plaintiff was the nurse being complained of and that she had been reported to Human Resources, not the White nurse about whom the patient had actually complained.

53.     After Plaintiff discovered that she was not the nurse subject to the patient's complaint, she also learned that that White nurse was neither reported to HR nor disciplined in any way by Truman.

54.     After the above-mentioned race/color based discriminatory treatment and retaliation continued without any effort on Defendants' part to address them, it started to take an emotional toll on Plaintiff leading to a lot of stress and anxiety.

55.     Indeed, the fact that, once Defendants and Truman found out that the patient's complaint was actually about a White nurse, instead of Plaintiff, a Black woman, Defendants simply dropped the investigation smacked of racial discrimination and resulted in Plaintiff suffering severe

emotional distress for being treated as a second-class employee in the workplace solely because of her race and/or color.

56.     By that point, Defendants, by and through their agents and/or employees, particularly Truman, had engaged in a concerted effort to get rid of Plaintiff, either via termination or by driving Plaintiff to quit, and this treatment was getting worse now that Plaintiff complained about discrimination and unequal treatment.

57.     In fact, Plaintiff was generally and consistently treated differently in the workplace, ignored, and dismissed by Plaintiff's superiors for no reason besides her race and/or color.

58.     For example, Defendants, by and through Truman, constantly micromanaged Plaintiff's work, which they did not do to non-Black nurses, and kept her under a microscope in an effort to find some slip-up that would lead to Plaintiff's termination.

59.     On or about June 25, 2020, Plaintiff received an email from Truman saying that Truman wanted to meet with Plaintiff and a UNAP representative about another patient complaint.

60.     The UNAP representative, Frank Sims ("Mr. Sims"), who was also the Rhode Island Hospital-UNAP President, was next available on July 1, 2020, so a meeting was scheduled for that day after Plaintiff's shift ended at 7:30 am..

61.     The meeting was attended by Plaintiff, Mr. Sims, Truman, Assistant Clinical Manager Tara Bautista ("Ms. Bautista"), and Eric Smith ("Mr. Smith"), Human Resources Business Partner.

62.     During that meeting, Plaintiff was informed that a patient had reported her for not providing pain medication during Plaintiff's shift, specifically accusing Plaintiff of going into patient's room, touching patient's IV bag and then leaving.

63.     Plaintiff also learned that another White or non-Black nurse had made a complaint about her, alleging that Plaintiff had not helped her with something and that Plaintiff was "the most obnoxious person", but no additional information was provided to Plaintiff about that nurse's complaint.

64.     As with the prior patient complaints purportedly made against Plaintiff, Truman did not conduct *any* investigation prior to escalating the complaint to HR's attention.

65.     On information and belief, Truman did not escalate complaints about White or non-Black nurses to HR without first conducting an investigation.

66.     Truman and Mr. Smith wanted Plaintiff to sign a written warning and attend counseling, but Mr. Sims said that the claim should be investigated before Plaintiff was required to sign the written warning.

67.     During that meeting, Plaintiff asked why any purported complaints about her were always being escalated and reported to HR rather than being investigated, and Truman responded that it was because of "perception."

68.     Plaintiff believed that Truman was referring to how others perceived Plaintiff's race/color and related cultural differences.

69.     The meeting ended and Plaintiff assumed that an investigation would be conducted into the purported complaints as per Mr. Sims suggestion and Truman and Mr. Smith's response.

70.     On or about July 8, 2020, Plaintiff texted Mr. Sims to ask if he had learned anything since the meeting on July 1, 2020.

71.     Mr. Sims advised Plaintiff that she should contact Truman, so Plaintiff sent an email to Mr. Sims and copied Truman, explaining in detail that Plaintiff had reviewed medication documents from the night in question, that Plaintiff had medicated the patient in accordance with the patient's medical orders and did not believe that the complaint was justified.

72.     Plaintiff also explained that she did not understand what Truman meant when she kept saying "perception," and Plaintiff again asked why complaints about her were never investigated and instead Plaintiff was immediately treated like she was guilty.

73.     Plaintiff further wrote that all complaints, no matter how minute should be investigated, because not all complaints are legitimate or justified.

74.     As an example, Plaintiff specifically referenced a patient complaint made against her, prior to Truman becoming her supervisor, that was made because the patient did not like Plaintiff's braided hair.

75.     When that complaint was made many years ago, Plaintiff's then supervisor investigated it, learned that it was not legitimate, and resolved the matter without having to involve HR.

76.     Ms. Truman responded to Plaintiff's email a full week later, writing that they should meet to discuss the concerns outlined in Plaintiff's email and asked when Mr. Sims would be available.

### *Abrupt Suspension and Termination*

77.     On or about July 20, 2020, Plaintiff and Mr. Sims met with Truman, Mr. Smith, and Ms. Bautista, to discuss Plaintiff concerns.

78.     At the time of the meeting, Plaintiff had not been given any information about the investigation into the most recent complaint, so she was not prepared to discuss it and defend herself

79.     When the meeting began, Plaintiff immediately explained that she believed she was constantly being mistreated, discriminated against, harassed, and picked on by Truman because of her race and/or color, including Truman's practice of escalating every minute complaint to HR when Truman was not doing that with other nurses.

80.     Additionally, Plaintiff explained that her personnel file had been clear of any complaints or discipline prior to Truman becoming Plaintiff's unit manager.

81.     Plaintiff also said it had begun to feel like a hostile work environment and that she wanted to file a formal complaint.

82.     When they began discussing the most recent complaint, Plaintiff brought out documentation showing when she had medicated the patient on the night in question.

83.     As soon as Plaintiff brought out the handout, Mr. Smith took the paper and said that Plaintiff had violated HIPAA.

84.     According to Lifespan's HIPAA-related policies, documents containing patient information were not permitted to be removed from the building.

85.     Plaintiff told Mr. Smith that she brought the sheet as evidence to show the medication that was provided, since Plaintiff had not been questioned about it since our last meeting and had no reason to believe that the investigation we previously discussed had been conducted or concluded.

86.     Everyone except Plaintiff then left the room, including Mr. Sims.

87.     Mr. Smith never returned the documentation showing that Plaintiff had properly medicated the patient on the night in question and Plaintiff never got them back.

88.     Mr. Sims returned to the room and told Plaintiff that she was suspended because of the alleged HIPAA violation.

89.     On or about August 2, 2020, Plaintiff sent an email to Mr. Smith in the HR Department requesting information on her suspension and explaining her formal complaint against Truman for racial discrimination.

90.     Plaintiff again explained how she has repeatedly been threatened with disciplinary action and had false complaints escalated to HR by Truman without any investigation, while White nurses were never disciplined for the same or worse conduct.

91.     Plaintiff also told Mr. Smith that she was still being racially discriminated by being punished for the HIPAA violation because Defendants' HIPAA policy prohibited any transmission of patient information via text, picture, mail, etc., and Plaintiff knew that another White nurse had recently taken a picture in a patient's room and texted it to Truman and another nurse and that nurse did not receive any disciplinary action.

92.     In that email, Plaintiff also noted the disparate treatment she received compared to White nurses.

93.     Only two days later, August 4, 2020, Plaintiff received an email from Mr. Sims informing her that Defendants were terminating Plaintiff's employment allegedly for the HIPAA violation, but that they would allow her to choose to resign, which would allow Plaintiff to extend her health insurance.

94.     On information and belief, the reason given for Plaintiff's termination was just a pretext for race/color discrimination and/or retaliation for Plaintiff asserting her right to be free from discrimination in light of the fact that White nurses were not disciplined or terminated for similar alleged violations and also because the proffered reason for termination is patently absurd.

95.     Plaintiff spoke to Mr. Sims later that day and he told her that he spoke with Truman who said there was nothing she could do about the termination because it had gone too far with the HR Department.

96.     Mr. Sims also informed Plaintiff that Truman represented that, if Plaintiff voluntarily resigned, Defendants would extend Plaintiff's health insurance to the end of the month and not contest Plaintiff's application for unemployment benefits.

97.     Plaintiff told Mr. Sims that this was exactly what Truman and Defendants had wanted all along, which was why Truman kept referring any complaints against Plaintiff to HR, whether they were legitimate or not.

98.     Plaintiff then sent an email to Mr. Sims stating that she would not resign.

99.     On or about August 13, 2020, Plaintiff received a call from Mr. Smith asking whether anyone else had access to the patient-related documents that Plaintiff brought with her to the meeting, if Plaintiff had thrown away any patient documents from her locker after the meeting, and whether Plaintiff had been contacted by the corporate compliance line.

100.    Plaintiff responded, no, to all questions.

101.    On information and belief, Plaintiff was not contacted by the corporate compliance line because the alleged HIPAA violation was not even reported evidencing Defendants' awareness that the incident, even if true, did not warrant termination.

102.    Also, Mr. Smith informed Plaintiff that nothing had been done about the patient complaint following the July 1 meeting.

103.    Plaintiff reiterated to Mr. Smith that she had been mistreated, harassed, and discriminated against because of race and/or color by Truman.

104.    However, Mr. Smith simply responded that Plaintiff was terminated, and she would receive COBRA benefits and vacation pay.

105.    On information and belief, Defendants replaced Plaintiff or had her work duties assumed by one or more non-Black workers.

### Pretext and Discriminatory Animus

106.    Defendants purported justification for Plaintiff's suspension and subsequent termination because of an alleged minor violation of Defendants' HIPPA policies, in direct violation of the Defendants' own progressive discipline policy and on the exact same day and during a meeting to address Plaintiff's complaints of racial discrimination and unequal treatment, supports an inference of discriminatory/retaliatory intent.

107.    Defendants' Lifespan's HIPPA Privacy Sanctions Policy identifies two types of violations subject to different levels of sanctions:  Type I covers violations with the intent to do harm, which are sanctioned by a final written warning and/or termination; Type II violations cover unintentional disclosure of PHI or records, which are sanctioned by "[m]eeting with one or all of the following Manager/HR/CMO who will discuss the occurrence and a collegial intervention will take place with education, and/or give documented verbal warning with notification to Compliance Department, based on the investigation findings."

108.    Plaintiff's conduct clearly had no intent to do harm so did not constitute a Type I violation supporting termination.

109.    Further, because Plaintiff's alleged technical violation of the policy did not result in the disclosure of any PHI to anyone, such conduct did not constitute a Type II violation.

110.    Nonetheless, even if Plaintiff's conduct had been a Type II violation or some other non-Type I HIPPA violation, Defendants, according to their own policy, should have conducted an investigation, and then had a "collegial intervention" by providing counseling and/or a documented verbal warning.

111.    Instead, Defendants immediately suspended Plaintiff on July 20, 2020, decided to terminate her employment, and only purported to conduct an investigation on August 13, 2020 when Mr. Smith called Plaintiff to ask if the PHI had been disclosed to anyone, after the decision to terminate Plaintiff had already been made.

112.    On information belief, Defendants have not terminated White employees on similar grounds without following their own policy.

113.    Plaintiff's termination without any verbal or written warning or an opportunity to correct any purported deficiency in direct violation of the Defendants' own progressive discipline policy demonstrates pretext and a discriminatory intent.

114.    At all relevant times, Plaintiff was the only Black, African-American employee in her department and, as a long-standing older employee within the protected age ground, she earned significantly more than her co-workers.

### *Race/Color Discrimination*

115.    Plaintiff is a Black, African-American female of Nigerian descent and, at all relevant times, within a protected class.

116.    In her department of approximately twenty (20) nurses, Plaintiff was the only Black, African American female of Nigerian descent.

117.    For the reasons described above, Defendants' conduct constitutes racially, color, ethnicity motivated and unlawful discrimination under Title VII, FEPA, and the RICRA.

118.    The fact that Plaintiff is a Black, African-American female of Nigerian descent was a motivating factor in the discriminatory treatment and eventual termination that she suffered at the hands of Defendants.

119.    Adverse employment action based in whole or *even in part* on account of race and/or color and/or ethnicity constitutes prohibited discrimination and/or retaliation.

120.    Additionally, at all relevant times, Plaintiff was subjected to race, color, and/or ethnicity based discriminatory conduct with the purpose or effect of unreasonably interfering with her work performance or creating an intimidating, hostile or offensive work environment for the reasons set forth herein.

121.    Said discriminatory conduct resulted in Plaintiff having to endure working conditions that are both objectively and subjectively offensive, severe, and pervasive.

122.    Defendants' failure to follow its own policies and procedures relative to unlawful discrimination, harassment, and retaliation further supports an inference of discriminatory intent.

123.    The temporal proximity of Plaintiff's protected conduct to Defendants' adverse employment action also raises a compelling inference of discriminatory and retaliatory intent.

### *Age Discrimination*

124.    Defendants discriminated against Plaintiff in the terms and conditions of her employment on account of her age; including that Defendants terminated Plaintiff on or about August 13, 2020.

125.    At the time of Plaintiff's termination, she was sixty-one (61) years old and was in a protected age class.

126.     Moreover, at the time of her termination, Plaintiff's total compensation package with Defendants was valued at approximately $122,000.00 in addition to benefits and substantially more than her younger coworkers.

127.     On information and belief, Plaintiff was replaced, or her duties were assumed by one or more younger workers, thereby establishing a *prima facie* case of age discrimination.

128.     Indeed, on information and belief, Plaintiff was replaced or had her duties assumed by a White nurse in her early thirties (30's).

129.     On information and belief, Plaintiff's replacement is or was paid less compensation and/or benefits than the Defendants had been paying to Plaintiff, thereby further supporting an inference of age discrimination.

130.     Moreover, Defendants did so without first offering Plaintiff the opportunity to continue her employment for less compensation and/or benefits.

131.     It is more plausible, and therefore more likely than not, that Defendants terminated Plaintiff, an older employee who was well paid and with full benefits, because of the cost savings in replacing Plaintiff with one or more younger, lower paid workers.

132.     Moreover, on information and belief, Defendants have engaged in a pattern and/or practice of age discrimination.

133.     Defendants' age-based discriminatory animus is further supported by the Plaintiff's prior reports of age-based discrimination in the workplace, including at least one (1) incident where a supervisor stated to Plaintiff, "maybe it's time for you to go work somewhere else that is not that busy. It is hard to be a bedside nurse at your age" while also telling Plaintiff that she got paid a lot of money.

*Retaliation*

134.     At all relevant times, Plaintiff complained to Defendants about unequal treatment and specifically raised race/color-based discrimination regarding the terms of Plaintiff's employment and her treatment in the workplace prior to her suspension and termination.

135.     Under Title VII, FEPA, RICRA, and the Whistleblower Act, Plaintiff is expressly protected from retaliatory conduct by an employer for voicing her concerns of ongoing race/color discrimination.

136.     When Plaintiff reported what she believed to by race/color discrimination, she was engaged in a protected activity.

137.     While Plaintiff was engaging in the above-mentioned protected activity, Defendants entered into a concerted effort to end Plaintiff's employment by retaliating against her stated herein.

*Motivation and Harm*

138.     Defendants' intent to discriminate against Plaintiff on account of her race and/or color and/or ethnicity and/or age and/or retaliate against her for engaging in protected activity is further established, in part, by the fact that White, non-African American workers and younger workers were routinely treated better than Plaintiff in terms of work hours, handling of patient complaints, and discipline.

139.     Defendants' failure to follow their own policies and procedures relative to investigating patient complaints and discipline further supports an inference of discriminatory intent.

140.     Additionally, the temporal proximity of Plaintiff's protected conduct to the Defendants' adverse employment action, almost immediately, also raises a compelling inference of discriminatory intent by Defendants.

141.     Plaintiff has suffered and will continue to suffer equitable and compensatory damages, including, but not limited to, loss of income, pain and suffering, emotional distress, loss of enjoyment of life, loss of medical and/or other benefits, humiliation, damage to her professional and personal

reputation, and other great harm as a result of being discriminated/retaliated against by Defendants in the manner alleged herein.

## VII.    Claims for Relief

142.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 141 of this Complaint in each of the counts below with the same force and effect as if set forth therein.

### Count One
### *Title VII of the Civil Rights Act of 1964,*
### *42 U.S.C. §2000e, et seq*

143.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's race, color, and/or ethnicity and/or retaliated against her for engaging in protected activity in violation of Title VII, and thereby deprived her of rights secured under Title VII, causing Plaintiff to suffer damages as aforesaid.

### Count Two
### *Age Discrimination in Employment Act,*
### *29 U.S.C. § 621, et seq.*

144.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, engaged in unlawful employment discrimination on the basis of age in violation of the Age Discrimination in Employment Act which has caused Plaintiff to suffer damages as aforesaid, and for which Plaintiff is entitled to relief pursuant to that Act.

### Count Three
### *Rhode Island Fair Employment Practices Act*
### *R.I. Gen. Laws §28-5-1, et seq.*

145.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment practices against Plaintiff on account of Plaintiff's discrimination on the basis of Plaintiff's race, color, or ethnicity

and/or age  and/or retaliated against her for engaging in protected in violation of the FEPA, and thereby and otherwise deprived her of rights secured under the FEPA, causing her to suffer damages as aforesaid.

**Count Four**
***Rhode Island Civil Rights Act of 1990,***
***R.I. Gen. Laws § 42-112-1, et seq.***

146.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment practices against Plaintiff on account of Plaintiff's discrimination on the basis of Plaintiff's race, color, or ethnicity and/or age  and/or retaliated against her for engaging in protected in violation of the RICRA, and thereby and otherwise deprived her of rights secured under the FEPA, causing her to suffer damages as aforesaid.

**Count Five**
***Rhode Island Whistleblower Protection Act,***
***R.I. Gen. Laws § 28-50-1, et seq.***

147.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful retaliation against Plaintiff in violation of the Whistleblower Act, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the Whistleblower Act.

**VIII.   Prayers for Relief**

**WHEREFORE**, Plaintiff prays that this Honorable Court grant the following relief:

1.    A declaratory judgment declaring that the acts and/or omissions of Defendants, including, but not limited to those complained of herein, are in violation of the, Title VII, ADEA, FEPA, RICRA and Whistleblower Act;

2.      An injunction directing Defendants to take such affirmative action as is necessary to refrain from such conduct as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated;

3.      An injunction or other equitable relief, including, but not limited to, an award of back pay, front pay or reinstatement, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct;

4.      An award of compensatory damages;

5.      An award of liquidated damages;

6.      An award of exemplary and/or punitive damages;

7.      An award of prejudgment interest, reasonable attorneys' fees, and costs; and,

8.      Such other and further relief as this Court deems just and proper.

## IX.     Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## X.      Designation of Trial Counsel

Plaintiff hereby designates Richard A. Sinapi, Esq. and Danilo A. Borgas, Esq., as trial counsel.

Plaintiff,
Veronica S. Akpan
By her attorneys,
**SINAPI LAW ASSOCIATES, LTD.**

Dated: July 18, 2022            /s/  **Richard Sinapi**
                                **Richard A. Sinapi, Esq. (#2977)**
                                **Danilo A. Borgas, Esq. (#9403)**
                                2374 Post Road Suite 201
                                Warwick, RI 02886
                                Phone:  (401) 739-9690
                                FAX: (401) 739-9490
                                Email: ras@sinapilaw.com
                                        dab@sinapilaw.com

**Page 20 of 20**